# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
Assigned on Briefs December 7, 2011

## STATE OF TENNESSEE v. RICHARD DALE CAPPS

**Direct Appeal from the Circuit Court for Bedford County**
**No. 16943    Lee Russell, Judge**

---

**No. M2010-02143-CCA-R3-CD - Filed September 4, 2012**

---

A Bedford County Grand Jury returned an indictment against Defendant, Richard Dale Capps, charging him with two counts of aggravated assault and one count of conspiracy to commit aggravated assault. An indictment was also returned against co-defendant Sarah Malone charging her with conspiracy to commit aggravated assault. The present appeal only involves Defendant. Following a joint jury trial, Defendant was convicted of aggravated assault, reckless aggravated assault, and conspiracy to commit aggravated assault. Co-defendant Malone was convicted as charged. Defendant was sentenced as a Range II offender to eight years for aggravated assault and six years for conspiracy to commit aggravated assault with the sentences to be served concurrently in confinement. Defendant's conviction for reckless aggravated assault merged with his conviction for aggravated assault. On appeal, Defendant argues: (1) that the evidence was insufficient to support his convictions; (2) that the trial court erred in denying his request to admit the prior inconsistent statements of Andrew Pugh and Maurice Smith as substantive evidence; and (3) that the trial court improperly sentenced Defendant as a Range II offender because the State did not give timely notice of its intent to seek enhanced punishment. After a thorough review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed

THOMAS T. WOODALL, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

James O. Martin, III, Nashville, Tennessee (on appeal); and Andrew Jackson Dearing, District Public Defender; and Catherine Hickerson, Assistant District Public Defender, (at trial) for appellant, Richard Dale Capps.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; Charles Frank Crawford, Jr., District Attorney General; and Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Background

The victim, James Allen Flippo, testified that he and Sarah Malone dated for three or four months in 2009, and she and her three children moved in with him and his mother approximately three days after he met Ms. Malone. Ms. Malone later moved out in July of 2009 and back into a trailer that she had previously rented in the King Arthur Trailer Park. The victim said that he had been to the trailer to ask that some of his belongings be returned. He said that there was not much contact between Ms. Malone and him until one weekend in late September of 2009 when she called and asked him to bring her some beer and cigarettes. The victim was aware that Ms. Malone was living with Defendant at the time, but she told him Defendant would not be there. The victim then drove to Ms. Malone's trailer to deliver the items. He said that they sat in his Jeep and talked for approximately thirty minutes, and Ms. Malone went back inside the trailer. The victim testified that "Mr. Pugh," later identified as Andrew "Andy" Pugh, walked up to the Jeep while he and Ms. Malone were talking. He said that Ms. Malone called him a second time that weekend and asked for more beer. The victim delivered the beer to her and went inside the trailer for approximately ten minutes and left.

The victim testified that he was awakened by a phone call from Ms. Malone at approximately 4:00 a.m. on October 3, 2009. He and his mother both answered the call. He said that Ms. Malone "acted excited like she was in a panic, she said, can you come over?" The victim agreed to do so and drove to Ms. Malone's trailer. When he arrived, there were no other vehicles in the driveway, and he sat in the driveway until Ms. Malone greeted him and invited him inside. The victim testified that Ms. Malone told him that she had been to the hospital earlier in the day, and he thought that he was taking her back to the hospital. When the victim asked about Defendant, Ms. Malone indicated that he was "in Nashville with his boys." The victim sat down on a couch inside the residence and waited for Ms. Malone to get ready.

After three or four minutes, there was a knock at the door. Ms. Malone opened the door, and the victim saw Defendant, Andy Pugh, and Maurice Smith walk in. The victim testified that he decided to leave but Defendant said, "[Defendant] says stand up, [Defendant] says sit down." After sitting down and standing up a couple of times, the victim again attempted to leave. When the victim stood up, he said that Defendant and Maurice

Smith began hitting him with their fists and pushing him toward the back of the trailer. Andy Pugh stood at the door and watched. At some point, the victim broke free of Defendant and Mr. Smith and ran toward the door. He said that someone grabbed the back of his shirt, and Defendant then hit him on the left side of the head with a beer bottle, shattering the bottle and cutting his ear. The victim testified that he finally made it out of the residence and into his Jeep. However, Defendant walked up, opened the door, and attempted to pull him out of the vehicle. The victim testified that he started the vehicle, put it in reverse, and backed up throwing Defendant off of the vehicle. He then put the Jeep in drive and left the trailer park. As the victim left, he did not know Ms. Malone's whereabouts or that he had run over her.

The victim testified that he drove home, and Officer Holden pulled up behind him and prevented him from going inside the house. Officer Holden told the victim that he needed treatment so the victim was taken by ambulance to the emergency room. The victim noted that his ear was nearly severed, and he had a visible scar from the injury. Officer Jerry Lawrence later told the victim that he ran over Ms. Malone as he was leaving the trailer park.

Dr. Salah Faour, an emergency room physician at Heritage Medical Center, treated the victim on October 3, 2009. He said that the victim had head trauma and a large laceration to his ear. The victim was also complaining of a headache. His blood pressure and heart rate were high at the time, and he indicated that his pain level was seven out of ten. He told Dr. Faour that he had been assaulted by some individuals and punched in the head multiple times. He also indicated that he had been hit by a beer bottle. Dr. Faour testified that the cut to the victim's ear was two inches long, and basically went all the way through the ear. Dr. Faour placed several stitches in the victim's ear, and the victim was given a CAT scan of his head and pain medication due to the injuries. He said that Defendant was later discharged and given an antibiotic.

Andrew "Andy" Pugh testified that he was living in the King Arthur Trailer Park with David Vincent in 2009, a couple of trailers down from Defendant and Ms. Malone. On Friday night, October 2, 2009, into the early morning hours of October 3, 2009, he was at Defendant and Ms. Malone's trailer with Maurice Smith, Joshua "Josh" Pugh (Andy's brother), and Brandy Newman. Everyone was drinking except for Josh Pugh. At some point, Andy Pugh heard Defendant talk about moving his car around the corner, effectively hiding it, because the victim was coming over. Andy Pugh testified that he left Defendant and Ms. Malone's trailer and went to Vincent's trailer. He and Maurice Smith were later awakened by Josh Pugh, and they went outside where Defendant was waiting. The three men stood behind a nearby empty trailer "kind of hiding a little bit" and waited for "dude" (the victim) to pull up. Andy Pugh testified that the victim then pulled into the driveway of Defendant and Ms. Malone's trailer in a Jeep, got out, and went inside the trailer. Andy Pugh testified that he recognized the victim because he had seen the victim at the trailer a few days earlier

talking to Ms. Malone who was sitting in the passenger side of the Jeep. He said that the victim and Ms. Malone appeared to be having a pleasant conversation at that time.

Andy Pugh testified that as he, Defendant, and Mr. Smith walked up to the trailer, Ms. Malone came out and said, "he's in the house." He said that he thought Defendant was going to start a fight with the victim. Andy Pugh testified that when he, Defendant, and Mr. Smith walked in the trailer, Defendant said, "[W]hat are you doing in my house, man[?]" Andy Pugh said that the victim, who was sitting on the couch, looked stunned. When the victim attempted to leave, Defendant told him, "[Defendant] says get up, [Defendant] says sit down." After a couple of times, the victim indicated that he was going to leave. Andy Pugh said that Defendant then attacked the victim shoving him into the wall and into the kitchen. Defendant was also hitting the victim with his fist, and Mr. Smith "threw" a couple of punches. Andy Pugh testified that Ms. Malone was saying, "beat the Mfers's ass." He testified that the victim did not attempt to hit anyone and was trying to protect himself. Andy Pugh said that at some point, the victim was able to "kind of swerve" through the two men, and as he ran toward the door, Defendant hit the victim in the head with a beer bottle. The victim then stumbled out the door and to his Jeep. Andy Pugh testified that Defendant and Ms. Malone ran after the victim and attempted to pull him back out of the vehicle. He said that the victim started the Jeep and put it in reverse knocking Defendant and Ms. Malone backwards. Andy Pugh testified that Defendant "flew across the road into the grass, and [Ms.Malone] kind of rolled up under the vehicle." Andy Pugh said that the victim ran over Ms. Malone when he pulled forward and left the trailer park. She was later taken to the hospital by ambulance.

Andy Pugh testified that he later saw Defendant and Ms. Malone at a Kangaroo Market. He said that Ms. Malone tried to bribe him about what happened that night and said that he would get some money out of it. Defendant then told her to be quiet.

On cross-examination, Andy Pugh acknowledged that he gave a written statement to Officer Jerry Lawrence on October 4, 2009, at the police department. He told Officer Lawrence that Ms. Malone came out of the trailer and said that the victim was in the house and that she wanted him out. He wrote in the statement that Mr. Smith stayed back, and Defendant asked the victim to leave, but he would not. He also said that the victim swung at Defendant a couple of times, and Defendant hit the victim a couple of times and asked him to leave again. In the statement, Andy Pugh told Officer Lawrence that Defendant then hit the victim with a beer bottle, and the victim left running over Ms. Malone. Andy Pugh testified that most of the statement was a lie because Defendant was sitting in the room with him when he wrote it.

-4-

Andy Pugh testified that he gave a second statement to Detective Carol Jean on October 7, 2009. In the statement, Andy Pugh said:

> I was asleep in my bed, my brother Josh comes in and wakes me up and tells me to go out and see what's going on and make sure Sarah don't get hurt. So the guy in the Jeep pulls up and he goes in the house and sits on the couch. Then me, Maurice, Rick go over there. And Sarah comes out. She says, he is on the couch. So we go in and Rick plays with him, says stand up, then said, Rick says sit down. And then he told him to get up again. Then the guy started to get mouthy and that's when - -
>
> * * *
>
> - - shoving began and I stayed back. And Rick was throwing him around and throwing punches. And Maurice threw a couple of punches. And then they started heading toward the door and the guy was trying to get up and leave, but Rick picks up a beer - - picks a beer bottle up and hits him over the head. Then the guy went out to the door. Then Rick and Sarah chased after him to the Jeep.

Andy Pugh admitted that he did not write in the statement that there was a plot to set up the victim or that there was going to be a fight. He also did not say anything about hiding behind another trailer or that Defendant told him that there was going to be a fight. Andy Pugh testified that he knew his statement on October 4, 2009, was inconsistent with the statement on October 7, 2009.

Maurice Smith testified that he went to Defendant and Ms. Malone's trailer on the night of October 2, 2009, to locate Josh and Andy Pugh. He said that Andy Pugh and Josh Pugh were at the trailer along with Defendant, Ms. Malone, and Brandy Newman. Mr. Smith remained at the residence for a while and heard Ms. Malone talking about the victim. He said that after Josh Pugh and Ms. Newman left the trailer, Ms. Malone and Defendant used a cell phone to call the victim, and Ms. Malone asked him to come over. Mr. Smith testified that Ms. Malone was planning to set the victim up and "beat his ass." He said that Ms. Malone told Defendant to move his car out of sight to a store beside the trailer park. Mr. Smith testified that Ms. Malone told him some things about the victim, and he agreed to participate in beating up the victim. He, Defendant, and Andy Pugh then went to Mr. Vincent's trailer to "hide and wait" near an empty trailer for the victim. Mr. Smith said he saw a vehicle pull up at Defendant and Ms. Malone's trailer. He, Andy Pugh, and Defendant walked around the empty trailer to Defendant and Ms. Malone's trailer and Defendant knocked on the door. Mr. Smith testified that Ms. Malone opened the door, and the three

men walked in. The victim was sitting on the couch, and Andy Pugh sat down on the love seat. Mr. Smith testified that Defendant played a "Simon says" game with the victim by telling him to stand up and sit down a couple of times.

Mr. Smith testified that the victim attempted to leave, and he and Defendant blocked his path, and Defendant began pushing the victim up against the washer in the kitchen. He and Defendant then began punching the victim. At some point, the victim broke free of the two men and headed toward the door. Defendant hit the victim in the head with a beer bottle, and glass shattered all over the couch. Mr. Smith testified that the victim ran out the door, and Defendant and Ms. Malone ran out after him, and Ms. Malone was saying something about messing the victim up and not letting him get away. Mr. Smith said that the victim got into his vehicle, and Defendant and Ms. Malone got inside the door, and it appeared that they were hitting him. Mr. Smith testified that the victim started his vehicle and backed up tossing Defendant across the street. He said that when the victim pulled forward, Ms. Malone was "dragged underneath the car," and the victim left the trailer park.

On cross-examination, Mr. Smith testified that he gave a statement to Officer Jerry Lawrence on October 3, 2009. In the statement, he said that all he knew was that the "car back[ed] out over the driveway and roll[ed] over the girl while she was down on the ground and drag[ged] her down the street." Mr. Smith testified that he lied in the statement because he was trying to "cover" for Defendant and Ms. Malone. He later spoke with police on October 9, 2009, in a tape-recorded conversation. Mr. Smith said that he probably told police that Josh Pugh woke him and Andy Pugh up while they were at Mr. Vincent's trailer and that all three of them went into Defendant and Ms. Malone's trailer. He did not know if he told police who called the victim or that he saw the victim reaching for his pocket. He did not remember saying that the victim overpowered Defendant while the two were wrestling. Mr. Smith did not recall telling police that he pushed the victim out of the trailer or that he did not know "if anybody had set this up."

Joshua "Josh" Pugh testified that he was at Defendant and Ms. Malone's trailer from Friday night, October 2, 2009, into the early morning hours of October 3, 2009. Mr. Smith, Brandy Newman, and Josh Pugh's brother, Andy Pugh, were also there. He said that Defendant and Ms. Malone were drinking and appeared to be "buzzing." Josh Pugh testified that Ms. Malone used Ms. Newman's phone, and she and Defendant went to the bedroom in the back of the trailer. They later came out of the bedroom and returned Ms. Newman's phone to her. Josh Pugh testified that Defendant moved his car from the trailer because Ms. Malone said something about it. He saw Defendant get into the vehicle and back out. Josh Pugh testified that Ms. Malone had told Ms. Newman that the victim wanted to do something with her children and that he was going to get his "ass whooped." Josh Pugh said that he decided that he and Ms. Newman needed to leave because he was on parole, and she

was on probation. So they went back to Dave Vincent's trailer at approximately 12:30 to 1:00 a.m.

Josh Pugh testified that he later woke up Andy Pugh and Mr. Smith and told them that they needed to make sure that Ms. Malone was all right. He explained that he had an uneasy feeling when he left Defendant and Ms. Malone's trailer, and he did not want anything to happen to Ms. Malone because she had kids at the residence. Josh Pugh said that Andy Pugh and Mr. Smith went outside, and he and Ms. Newman remained inside the trailer. While inside, Ms. Newman received a call from an elderly lady indicating that someone had called her from Ms. Newman's phone. Josh Pugh testified that he and Ms. Newman then heard a loud noise, and Mr. Smith ran in the trailer and said that Ms. Malone "had got run over."

Josh Pugh testified that he saw Ms. Malone the following day, and she asked him to tell everyone that Ms. Newman had called the victim. He said that Andy Pugh later told him about seeing Defendant and Ms. Malone at the Kangaroo Market. Josh Pugh testified that he told Andy Pugh to call Detective Jean, and he was present when Andy Pugh called her.

Officer Jerry Lawrence of the Shelbyville Police Department testified that he was dispatched to the King Arthur Trailer Park on October 3, 2009, at approximately 4:24 a.m. He arrived on the scene and saw Ms. Malone lying on the pavement injured. He asked Ms. Malone questions, but all she could say was that she wanted a cigarette. Defendant was agitated and could not stand still. They told Officer Lawrence that the victim hit Ms. Malone with his vehicle and fled the scene. By talking with some of the witnesses, Officer Lawrence "gathered" that the victim entered Defendant and Ms. Malone's trailer, and "as they arrived home they found him on their couch is what they stated." Defendant also indicated that there had been a physical altercation to remove the victim from the house.

Officer Lawrence testified that other officers located the victim, and he was transported to the hospital. His left ear was nearly severed. At the hospital, Officer Lawrence told the victim that he had run over Ms. Malone. The victim indicated that he was not aware of striking her, and that he was trying to get away. Officer Lawrence said that the victim told him that Ms. Malone called him over to the trailer. Officer Lawrence then took statements and turned the case over to Detective Carol Jean.

On cross-examination, Officer Lawrence testified that he asked several individuals to come to the police department on October 4, 2009, one of whom was Defendant. He said that Defendant was in the room with Andy Pugh when Andy wrote his statement. He did not hear Defendant tell Andy Pugh what to write.

Officer Chris Vest was dispatched to the victim's house, and he saw the victim standing on the front porch. He called an ambulance to take the victim to the hospital. He also saw a telephone number on the victim's caller ID where a call had been placed to the residence at approximately 4:00 a.m.

Detective Carol Jean testified that she reviewed the reports and statements from Officer Lawrence, and she conducted interviews and follow-up interviews. She obtained Josh Pugh's name from Brandy Newman, and spoke with him. Detective Jean testified that she did not take a written statement from Josh Pugh because his statement was corroborated by Ms. Newman, who was deceased at the time of trial. Detective Jean testified that she interviewed and re-interviewed everyone involved in the case.

Detective Jean did not feel that Andy Pugh told the truth in his first statement, and she asked him to come back in to conduct a second interview. She felt that there was a lot missing from Maurice Smith's statement, and she conducted a second more in-depth interview with him.

## II. Analysis

### I.     Sufficiency of the Evidence

Defendant challenges the sufficiency of the evidence for his convictions of aggravated assault and conspiracy to commit aggravated assault. He argues that the testimony of Andy Pugh, Josh Pugh, and Maurice Smith was not credible, and that there was insufficient proof of serious bodily injury to the victim. When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle*, 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn. 1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle,* 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

To support Defendant's conviction for aggravated assault, the State was required to prove that the Defendant intentionally or knowingly committed an assault and caused serious bodily injury to the victim pursuant to Tennessee Code Annotated sections 39-13-101(a)(1) and -102(a)(1)(A). Conspiracy is defined as:

> The offense of conspiracy is committed if two (2) or more people, each having the culpable mental state required for the offense that is the object of the conspiracy, and each acting for the purpose of promoting or facilitating commission of an offense, agree that one (1) or more of them will engage in conduct that constitutes the offense.

Tenn. Code Ann. § 39-12-103(a).

Defendant first contends that the evidence was insufficient to support his convictions because the testimony by Andy Pugh, Josh Pugh, and Maurice Smith was so incredible that their testimony should be "disregarded as evidence of the sufficiency of whether" Defendant and Ms. Malone conspired to assault the victim. However, it has been repeatedly held that questions about the "credibility of the witnesses, the weight to be given to their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as a trier of fact." *State v. Dotson*, 254 S.W.3d 378, 395 (Tenn. 2008)(citing *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007)); *See State v. Lewter*, 313 S.W.3d 745, 747 (Tenn. 2010); *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

Next, Defendant contends that the evidence was insufficient to show that the victim suffered serious bodily injury. We note that serious bodily injury may be established by "protracted or obvious disfigurement." Tenn. Code Ann. § 39-11-106(a)(34)(D). Defendant specifically argues that "[t]here is nothing in the record to support the scar would qualify as protracted or obvious disfigurement." At trial, the victim testified that Defendant hit him in the head with a beer bottle nearly severing his left ear and creating a two-inch laceration. He was eventually taken to the hospital by ambulance. Dr. Faour testified that in addition to the cut to the victim's ear, he was also complaining of a headache. His blood pressure and heart rate were high at the time, and he indicated that his pain level was seven out of ten. Dr. Faour placed several stitches in the victim's ear, and the victim was given a CAT scan of his head and pain medication due to the injuries. The victim was left with a permanent scar to his ear which he showed to the jury. This Court has held that a scar is sufficient to establish the element of serious bodily injury. *See State v. Anthony D. Forster*, No. M2002-0008-CCA-R3-CD, 2011 WL 1431980, at *10 (Tenn. Crim. App. April 12, 2011) *perm. app. denied* (Tenn. Aug. 24, 2011)(holding that a scar running from the middle of the bridge of the victim's nose down to her lip area was sufficient to establish serious bodily injury); *State v. Clay B. Sullivan*, No. M2004-03068-CCA-R3-CD, 2006 WL 644021, at *8 (Tenn. Crim.

App., Mar. 10, 2006) *no perm. app. filed* (holding that a two-inch scar was sufficient for finding of protracted and obvious disfigurement).

Viewing the evidence in a light most favorable to the State, the proof showed that Defendant and Ms. Malone lured the victim to their trailer during the early morning hours of October 3, 2009, for the purpose of beating him. Defendant moved his vehicle from the driveway of his residence so that the victim would not see it when he drove up, and Defendant hid behind an empty trailer with Andy Pugh and Maurice Smith and waited for the victim to arrive. After the victim went inside the trailer at Ms. Malone's request, Defendant, Mr. Pugh, and Mr. Smith then went inside the trailer. Defendant and Mr. Smith confronted the victim. As the victim attempted to leave, Defendant and Mr. Smith hit him with their fists and pushed him to the back of the trailer. The victim again attempted to leave, and Defendant hit him over the head with a beer bottle resulting in the two-inch laceration mentioned earlier that nearly severed the victim's ear. After the victim managed to get out of the residence, Defendant and Ms. Malone followed the victim out to his vehicle and attempted to pull him out of the vehicle to continue the assault.

Based on our review of the evidence, we conclude that the evidence was sufficient to support beyond a reasonable doubt Defendant's convictions for aggravated assault and conspiracy to commit aggravated assault. Defendant is not entitled to relief on this issue.

## II.     *Admission of Inconsistent Statements*

Next, Defendant argues that the trial court erred by not admitting as substantive evidence the two prior written statements to police by Andy Pugh and the written and recorded statement by Maurice Smith. Initially, we point out, as conceded by Defendant, that he failed to raise this issue in his motion for new trial. When the relief sought is a new trial, review on direct appeal is limited to issues specifically raised in a motion for new trial. Tenn. R. App. P. 3(e). "When an issue is raised for the first time on appeal, it is typically waived." *State v. Maddin*, 192 S.W.3d 558, 561 (Tenn. Crim. App. 2005); Tenn. R. App. P. 36(a)("relief may not be granted in contravention to the province of the trier of fact.").

Notwithstanding waiver, Defendant asks this Court to grant him relief as plain error. To recognize the existence of plain error, this Court must find each of the following five factors applicable: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (adopting the factors first articulated in *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)); *see also* Tenn. R. Crim. P.

52(b). "[A] complete consideration of all five of the factors is not necessary when it is clear from the record that at least one of them cannot be satisfied." *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)(citing *Smith*, 24 S.W.3d at 283).

In this case, we find that factor (5) does not apply. For a "substantial right" of Defendant to have been effected, the error must have prejudiced Defendant. "In other words, it must have affected the outcome of the trial court proceedings." *State v. Armstrong*, 256 S.W.3d 243, 250 (Tenn. Crim. App. 2008)(citing *United States v. Olano*, 507 U.S. 725, 732-37, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)(analyzing the substantially similar Fed.R.Crim.P. 52(b)); *Adkisson*, 899 S.W.2d at 642. Here, the trial court did not allow the two prior written statements to police by Andy Pugh and the written and recorded statement by Maurice Smith to be admitted as substantive evidence. However, Defendant was allowed to read portions of the statements in the jury's presence, and he was allowed to question the both witnesses concerning inconsistencies in the statements. Defendant is not entitled to relief on this issue.

### III. Late-filed Notice to Seek Enhanced Punishment

Finally, Defendant contends that the trial court improperly enhanced his sentence to a Range II, multiple offender status because the State failed to timely file its notice of enhanced punishment pursuant to Tennessee Code Annotated section 40-35-202(a). That code section provides:

> If the district attorney general believes that a defendant should be sentenced as a multiple offender, persistent or career offender, the district attorney general shall file a statement thereof with the court and defense counsel not less than ten (10) days before trial or acceptance of a guilty plea; provided, that notice may be waived by the defendant in writing with the consent of the district attorney general and the court accepting the plea.

*See also* Tenn. R. Crim. P. 12.3 which states:

> If the district attorney general intends to seek an enhanced punishment as a multiple, persistent, or career offender, the district attorney general shall file notice of this intention not less than ten (10) days before trial. If the notice is untimely, the trial judge shall grant the defendant, on motion, a reasonable continuance of the trial.

In the present case, the State's notice of enhanced punishment was not filed until the first day of trial. However, Defendant did not object at any time to the untimeliness of the

notice. During trial the following exchange took place concerning Defendant's prior convictions:

| | |
|---|---|
| THE COURT: | Okay. All right. General, is there going to be [a] 6.08, 6.09 [sic] [Tenn. R. Evid.]? Was there going to be any cross examination on his record? |
| [TRIAL COUNSEL]: | Judge, I was aware of his prior convictions. I've gone over them with him. |
| THE COURT: | Okay. |
| [TRIAL COUNSEL]: | I spoke to [the prosecutor] with him probably a couple three weeks ago. [The prosecutor] did file a 6.08, 6.09 [sic]. And I probably could come in here and holler it was late filed, but I knew about it, and I was aware of it and we had previously discussed that. So it's not like it was any surprise to me. |
| THE COURT: | All right. And your client, you made fully aware of what you believe would come in and what would not come in against him? |
| [TRIAL COUNSEL: | (Moves head up and down). |

In *State v. Stephenson*, 752 S.W.2d 80, 81 (Tenn. 1988), the Supreme Court held:

We are of the opinion that the fact the notice is not filed until the date trial begins does not render the notice ineffective in the absence of some showing of prejudice on the part of the accused, particularly where defense counsel does not move for a continuance or postponement of the trial as he is clearly authorized to do under [Tenn. R. Crim. P.] 12.3 (a). In the absence of a motion for continuance, in our opinion, any objection to the delayed notice by the State ordinarily should be deemed to have been waived.

Likewise in the present case, the issue is waived because Defendant did not ask for a continuance or object to the delayed notice of enhancement by the State, and he has not shown that he was in any way prejudiced by the later-filed notice. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgments of the trial court are affirmed.

_____

THOMAS T. WOODALL, JUDGE